Good morning, Your Honors. May it please the Court, Deputy Attorney General Tracy Angelopoulos, on behalf of Appellants. I would like to reserve three minutes for rebuttal, please. The District Court committed clear error in granting appellees motions for preliminary injunctions for two reasons. First, the District Court premised its order entirely on the likelihood that appellees would succeed on the merits of their Section 1983 claim to enforce preapproval of the State Plan Amendment, or SPA. That claim fails as a matter of law because there is nothing in the Medicaid Act requiring the State to obtain preapproval of a SPA, and there is nothing in the Medicaid Act conferring on providers an unambiguous right to enforce such a requirement. Second, it is undisputed that if CMS ultimately rejects the SPA issue and the State does not prevail in its administrative appeals of that decision, the Department of Health Care Services will reimburse providers 100 percent for any lost profits they may incur. Turning first to the merits of the SPA preapproval claim, a Section 1983 plaintiff must identify an individually enforceable right conferred upon it by Congress. In blessing, the Supreme Court held that this requires a plaintiff to show three things. First, the plaintiff must show that the statute in question was intended to benefit them, and in Gonzaga, the Supreme Court made clear that it wasn't just a benefit. It had to be an unambiguous right. Second, the plaintiff ---- Are you arguing now that ---- I thought the argument started off saying, well, we don't have to do it. Is this the second argument? Even if we have to do it, you don't have a cause of action? Is that what you're saying now? We don't have to do it, and we don't ---- they don't have a cause of action. I thought we were at now. I'm sorry, Your Honor. When you started speaking, I thought you were talking about, we don't have to do it. There's no requirement that we have the SPA approved before we implement our plan. And then I thought I heard it shifting to, in any way, they don't have a cause of action. Am I right? Is that where you are now? Or are you still talking about the first point? Your Honor, yes. They don't ---- Yes, what? I apologize. That was a disjunctive. The plaintiffs have not pointed to any statute requiring the State to obtain preapproval of a SPA. That's one of the requirements under Blessing. They must point to a statute that imposes an obligation on the State. That's point one. That's point one. Correct, Your Honor. Point two is that they haven't pointed to any statute that confers on them the right to enforce such an obligation. Point two. Okay. And, in fact, there are only three statutes in the Medicaid Act that really discuss SPA approval. 1396A subsection B states that the Secretary must approve a State plan amendment if it complies with the Medicaid Act. Are you back on the first one now? Yes. Your Honor, in order to proceed at all, they must show a statute that ---- Wait. Wait, wait, wait. I just want to make sure I can follow your argument. It seems to be flipping back and forth all the time. Like you said, yes, they don't have a cause of action. They don't have a cause of action given to them by the statute. And, in other words, for a SPA, we don't have to get prior approval. That's two separate issues. Now, which issue are you addressing so I can follow you? There is no statute requiring preapproval. That's what we're talking about now. Yes, Your Honor. So the question whether there's a cause of action conferred is irrelevant for the moment. The question is whether there is any obligation on the State to get the approval. Is that right? Yes, Your Honor. That is correct. Gotcha. There are only three statutes, as I was saying, that cover approval of a SPA. The second statute is 1396C, which requires the Secretary to inform the State that the State Plan Amendment does not comply with the Medicaid Act and to also notify the State that until the State Plan is brought back into compliance with the Medicaid Act, federal financial participation will be withheld. Section 1316 gives the State the right to seek reconsideration of a rejection of a State Plan Amendment and ultimately judicial review of that decision. None of these statutes require preapproval. And, turning to the second argument, none of these statutes confer upon providers an unambiguous right to enforce such a requirement. In Sanchez, this circuit looked at Section 1396A30A, which requires the State to pay provider rates that are adequate to ensure economy, efficiency, quality of care, and access to care. The Supreme Court, I mean, the District Court did not address the supremacy issue because of the pending Supreme Court case, correct? That is correct, Your Honor. All right. Do we need to wait for that case? I would say yes, Your Honor. We should wait for that case. I don't think we need to wait for that case to be decided to decide this issue that's before the Court regarding whether they have a Section 1983 claim to enforce. Well, but if we decide it on that basis and reverse it, then we're not waiting. Correct. I'm having a little of the same problem that Judge Fernandez is having. I'm saying if we wait, then we would decide, because we always can decide standing, and so that might be another issue. The District Court avoided that. So I'm saying should we wait for that case to decide the whole thing, or do we just decide the 1983 part of it? And if you were to prevail, then it goes back to the District Court for them to wait for that? Or how does that work? Because this is just a preliminary injunction, right? Yes, Your Honor. We think that the case should be decided solely on the Section 1983 issue. Plaintiffs had made the argument in their briefing that even if you decide that they can't move forward on Section 1983, they still have the supremacy. Well, they might be right. They may be right, but to the extent you were inclined to uphold the injunction based on the supremacy cause of action, we would urge the Court to wait until the Supreme Court has issued its rulings in the independent living cases, because it would be imprudent in our view to enjoin these rights, given the fact that that decision may wipe out that cause of action. All right. That didn't really help me, but okay. It would be imprudent to do what? To enjoin them? Uphold the injunction based on the supremacy clause argument, which is an argument that plaintiffs have made in the briefing to this Court. Right. That regardless of what you decide on the 1983 cause of action. They spent about five pages on it in this enormous brief, and I think you spent about the similar amount. Yes, Your Honor. On the supremacy clause issue. We do not believe that the supremacy clause issue should be the basis for upholding the injunction here, nor do, as we were discussing, we do not believe that their Section 1983 claim has merit. As I was saying, in Sanchez, this circuit looked at Section 38, which requires provider payments to be adequate to ensure efficiency, economy, quality of care, and access of care. And in looking at that section, the Ninth Circuit determined that even though it mentioned provider payments, it wasn't enough to confer on providers an unambiguous right to enforce that section. If we get past that, did the plaintiff appellees demonstrate irreparable harm, given that the Eleventh Amendment bars them from recovering damages? Thank you, Your Honor. That's where I was turning to next. We submitted a declaration from the director of the Department of Health Care Services, Toby Douglas, who stated unambiguously that if the spot is ultimately rejected by CMS and we lose our administrative appeals on that issue, we will reimburse providers 100 percent for their lost profits. Can he bar the state legislature and the governor and all the other people that decide whether you can take money out of the treasury of the state of California? He is the director of the Department of Health Care Services.  And he has the authority to bind the department. And that's why we submitted a declaration. Who binds what the department gets, though? And even so, can they make a promise like that that really affects the central question for us, which is this court would lack the jurisdiction to impose or compel the state to pay? I mean, it's one thing the state promises we will pay. So what if they don't follow through? What if the legislature doesn't appropriate the funds? It's clear, isn't it, that nobody can go into the federal courts and then tell the state that they have to pay because don't they have immunity? That pesky old 11th Amendment? Yeah, I mean, doesn't the 11th Amendment pose like a huge problem? And at that point, is it our discussion? I mean, we can accept at face value the promises made by the director, but that doesn't really resolve the issue for us. I mean, that's it. Why am I wrong? I agree that the 11th Amendment bars retroactive relief in federal courts. But what we've said in our declaration is you don't even have to go to court because if our spot is ultimately rejected by CMS, we will pay providers 100 percent of their lost profits. But that's what you said, but how do you enforce it? I mean, that was really the question we were trying to explore. Are you here today able to waive the 11th Amendment for the state of California? No, Your Honor, I'm not here to do that. Okay, so you can't do that. So all you can do is tell us that the director is really a good guy and what he says is going to happen. True? Well, he's the director of the largest department in California, and he has said we will pay them back their lost profits. But as I recall, directors come and go, do they not? In fact, I think he came in place of a guy named Jolly, Maxwell Jolly, right? So they come and go, and I take it their views of the law come and go? They do come and go, but his word binds the department as the highest official of that department. And that's why we presented his declaration and not the declaration of some manager or associate director. Instead, we chose to go to the very top and to say that the department will reimburse providers if this spot is ultimately rejected. But we don't even get to the harm question here, because at the end of the day they can't show that they can move forward or proceed on their Section 1983 cause of action. They have shown no statute conferring on them an unambiguous right to do so. The best they can do is point to Exeter, which is a 1997 decision by this circuit, in which the court held that the Borne Amendment requires the state to obtain pre-approval. But as we've pointed out in our briefs, Exeter has been or, pardon me, the Borne Amendment has been repealed. Well, let's just say on the issue of whether we wait for the Supreme Court, let's just say hypothetically that we said they can't, you know, that under 1983 they lose. But we don't know whether they lose under the Supremacy Clause, because we've got a case, we're waiting for the Supreme Court to say that. So would it be your argument, well, if they lose under 1983, then we should reverse right now because the state's being damaged by not being able to implement the statute. But let's just say that under, if the Supreme Court rules soon and it says that they could state a cause of action under the Supremacy Clause and it would be a basis to keep the injunction in place, that they would say if we dissolve it that they get hurt because they don't get paid, right? So... If I understand your question, Your Honor, you're asking if this court should wait to decide the issue. And what we would say is the court should reverse the preliminary injunction that was issued on the 1983 cause of action, send it back to the district court where it can be stayed pending the Supreme Court's decision on the independent living centers, and then if the Supreme Court upholds those decisions... But you would then enforce the statute, right? If we reverse the preliminary injunction, you would enforce the statute, and then they would lose the money, and then they would have to count on that you would pay them back because, right? Well, we would argue that it should all be stayed pending the Supreme Court's decision on ILC. If I understood your question correctly... Well, it seems to me, though, that you would want to... If we reverse the preliminary injunction, then you would want to go ahead and start proceeding under the statute until the Supreme Court said otherwise, right? They would have to get a new injunction. Yes, Your Honor. I see that I'm at two minutes, and I'd like to reserve my remaining time. Okay, thank you. Thank you. Craig Canizo, Hooper Money and Bookman for Appellees and Plaintiffs. If it pleases Your Honor, I would like to... Good morning. Good morning. Why don't you jump right in on the 1983 and identify the statutory provision that unambiguously allows private enforcement of the federal preapproval requirement through 1983? I'd be happy to address that, Your Honor. We believe that 1396A, small a, 1316, which is the provision that requires the state to submit the plan for approval and obtain approval within a prescribed timeframe, and finally 1320-10A, the so-called suitor fix in 1994, all make clear that the providers can enforce the plan approval requirement. Well, to me, makes clear unambiguously means it says right in it that you have a private cause of action. I can understand that when it says it right in the statute. 1320A, so in light of the Supreme Court precedents during the 1990s where that requirement became more specific, clearer from the courts, the Congress specifically responded to the suitor decision with a statement that in any action brought to enforce the state plan requirements, it's not being unenforceable because it's structured as a state plan requirement. In my mind, it's hard to see how they could have stated their intent clearer because there would have been no need for that statute had it been the assumption of Congress that that plan requirement was unenforceable. It could have done it if it hadn't said, but we don't intend to expand any grounds. Well, that was no, that was. We don't intend to expand any grounds. Correct, Your Honor. How was it? Determine the availability of private actions. So. We don't intend to do any of that. It did not need to expand any grounds. That's clear. You're absolutely right, Your Honor, and I think if you place that 1994 statute in the sequence of what this Court had concluded on three separate occasions previously, namely that the state plan requirement was enforceable under Washington State, Oregon Homes, and Exeter, you would not need to expand any further grounds beyond what this Court had already established in the prior 14 years. But didn't the amendment itself specifically state that it was only intended to address the specific suitor problem and the specific statute addressed in suitor? And isn't that what the legislative history says? And then if we look at these other three statutes that you're talking about now, aren't they all about the relationship between the federal government and the state? And so how do you piggyback into this position where there's a private cause? Well, first of all, because this Court had previously decided that. They had decided that the overall structure of the Act, those provisions had given enforceable rights under 1983. They had explicitly decided that. Therefore, it was not necessary to expand any further rights. I think those rights had been established by this Circuit supremely on three occasions. And all that the suitor fix did was to say that whatever you had concluded, on what was enforceable rights as of that point, wasn't further reduced by the new suitor decision, which had held that you couldn't enforce state plan requirements as a private party. And the government's argument that the repeal of the Boren amendments, you think that's a red herring? It is a total red herring, Your Honor, because they argued just the opposite in Exeter. They argued that it was the enactment of Boren that somehow eviscerated the prior Washington State and Oregon Homes precedent. The Court rejected that. It didn't rely on the Boren amendment for its decision in Exeter. It said the overall structure of requiring a plan is sufficient, and it transcends the Boren amendment, because the Boren amendment is just one of, I don't know, 120 requirements. And Justice Hall in the Exeter decision said it's the overall structure of the Act that requires the plan approval that we are enforcing. And that's not affected by either the enactment or the repeal, but the state can't have it both ways. They can't argue that it was the enactment and then argue that it was the repeal that somehow gave rise to the state plan requirement. 1316, for example, is a transcendent provision that applies to the entire social ‑‑ most of the provisions and chapters of the Social Security Act. It's not even confined to Title 19. And, again, the overall structure of this, as you put it, this balance between the federal and state government is an enforceable provision, because otherwise what would you be left with? You would be left with essentially the state being able to implement unapproved plans, which may never be approved, and string that out indefinitely. They don't have any obligation to respond. That's apparent by the fact they haven't responded for the two years, two and a half years that they've had since this request for additional information came back from CMS. They haven't provided an explanation why they haven't responded. We're mystified. The statute forces the federal government, under risk of the plan becoming approved by operation of law, to act very promptly in 90 days. This is what Judge Levy focused on, and that's right in the statute. That's in 1316. He actually cites the regulations, but it's right in 1316. And it actually has happened where a plan slipped through and wasn't responded to in 90 days. But, in contrast, once the clock stops because the federal government says you haven't satisfied us that this is approvable, here's the questions we have, it's done pretty routinely, the state apparently can just sit on that. Well, the government doesn't have to put up with that, does it? I'll bet you the federal government can figure out a way to deal with that. Unfortunately, Your Honor, I don't believe that the remedy of shutting down the program is the most effective remedy. That sounds real effective to me. I agree with you. I've just had some difficulty convincing the highest officers in this administration and prior administrations that I've worked with for the last 36 years that that's what they have to do. So they rely on the court. That sounds a little bit like the death penalty is not effective. Don't you end up in that same argument that what the federal government can do is they can effectively oppose the death penalty, cut off the funding. The state then has to dramatically react in a way that keeps their citizens from falling off the cliff. Not a very attractive result. Also not a very attractive result, though, if we allow each of these independent organizations to come forward with their claims and you have, as I said in the Supreme Court argument, 700 district judges all trotting off in their own direction. So the problem becomes almost, to me, it's sort of mind-numbing because what do you do with a recalcitrant state government that's confronted with this huge budget problem and they just don't come forward with the evidence? First of all, the federal government did, after Exeter, I'm pleased, as you saw in our briefing, to report that they expressly adopted just Judge Levy and the Ninth Circuit's rationale in the 2001 state Medicaid director letter. I fear that they have not been literal in their enforcement of the language in that directive because it did say that as of the date of that letter, they weren't going to award federal financial participation or allow it to be drawn down if it was an unapproved plan. And unfortunately, I don't believe that has actually been followed, and that is why this kind of action is absolutely essential. In response to Justice Breyer's concern about primary jurisdiction, I think it was apparent that this type of action, Exeter, is the one thing that the entire court, with perhaps the exception of Justice Roberts, was very comfortable with, a preservation of the status quo ante so that the state cannot implement unapproved plan amendments. That solves 95 percent of the problem, and it's so wise that even this respondent, this appellant, accepted that proposition when the new cuts were enacted as part of this year's budget, as we noted on the first page of our briefing, where it notes that the new statute on the cuts expressly requires SPA approval. So essentially what we're confronted with here is a rearguard effort of a residual challenge to the federal approval requirement. Well, let's say, hypothetically, if we did not accept that you could state a cause of action under 1983 and we reversed on that basis, what should we do about the Supreme Court case? Should we just have you deal with it in the district court? Because neither side really spent, as Judge Fernandez pointed out, a huge amount of efforts briefing that issue because the district court specifically avoided it, knowing that there was a Supreme Court case pending. We think, Your Honor, that you can affirm and should affirm the injunction based on the existing precedent in Independent Living Center, the 2008 decision, that holds that if we are in the zone of interest. But horror of horrors if we don't, then? We would probably be confronted with a request by the state for a stay of further proceedings, which does create a horror because it then means that the plaintiff providers are forced to endure a rate reduction and the consequence isn't about getting money at the end, Your Honors. I want to disabuse you. It really means whether these providers can stay in business and will remain providers in this state. That is not a horror threat. That is a reality that once you start becoming dependent on the Medicaid program, it is not an easy thing, as the case of our providers, to transform yourself into something else. And so they will basically exit the state and exit the provision of these very essential critical services for the developmentally disabled and mentally retarded residents and beneficiaries. What about the payback concept? The notion, because that cuts both ways. If the state starts paying and they turn out to be right, then they have to somehow try to extract their money, I guess. And they have. And that could be harmful itself. But I'm thinking of the other side. They're saying, we swear and promise that we will pay you at the end. I don't believe, notwithstanding I'm sure Mr. Douglas' good intentions, that he can bind the state. If they want to waive the 11th Amendment, as they did by removing the independent living center case and removing the cloak of that 11th immunity, they can do that. But I don't believe Mr. Douglas has the authority to bind the legislature, the authority to bind the governor. And I've quite honestly never seen this type of promise of future payment after spotted approval ever fulfilled because, and I've only been doing this for 36 years, I've just never seen that. This court would not be able to enforce it. And this is similar to the argument that the state made in the Cal Farm case where they argued that a state court might be able to provide a financial retrospective remedy. And the Ninth Circuit rejected that in its Cal Farm decision because that wasn't the power of this court. You know, that's interesting. When you say we can't, we couldn't enforce it, it sounds like what you're saying that the state cannot come into a federal court and say, you know what, we're going to do X, Y, and Z, and we ask you to rule on that basis. That's what the state promises it's going to do, and we're binding the state to doing that. And it sounds like you're saying even though that happens, the federal court can't enforce its order that then says, okay, do it. I don't think you really mean that. Well, it certainly is, I mean, there may be an estoppel or equitable estoppel principle that would make that enforceable. But I want to emphasize that the Eleventh Amendment, I believe that it's been very clear from Supreme Court decisions how difficult it is and expressly the Eleventh Amendment immunity has to be waived. And I don't believe that's happening here. So it would have to be some kind of contractual or equitable estoppel theory. I agree with you. We would certainly try to make Mr. Douglas good on that. But I want to also emphasize. But even if there's estoppel, how would you have the ability to enforce payments that are now past due? I mean, I don't understand. I think that the estoppel arguments, it might be estoppel, you would have perhaps power as a state court or a federal court to say going forward that you have an obligation. I don't know how you can go back consistent with the Eleventh Amendment. I just don't see how that would work. I would have to say, Your Honor, I would not want to waive our right to attempt to do so. But we've never had such a case because, as I said a moment ago, we've never had such a promise. And just in the period that Independent Living Center has been litigated, which I've been involved with for three and a half years, we've had I think three or four different directors of the Department of Health Services. So I'm not so sure that one binds the other. And certainly a change in administration could produce such a result. It also is a red herring in the sense that this process of small approval, if the state can do what they've done, which is delay responding on the request for additional information infinitely, there's really no closed end. I can even represent to you when this process is likely to conclude. It could be a four or five, six-year period. And, frankly, getting the money for these providers six years from now will be moot because they will be out of business. They at least won't be doing business in California, unfortunately, and the beneficiaries will suffer as a result. The small approval process that was triggered by a disapproval of the spas that are at issue in the Independent Living Center case, they were disapproved last November. That process is ongoing. It can be appealed to the Court of Appeals directly from an adverse decision by the administrator. I think, realistically, if you look at the Court of Appeal decisions on these spa disapprovals, they're four or five or six years after the administrative action. All right. Unless there's additional questions by the Court, your time has expired. Thank you, Your Honors. Thank you. Your Honors, I'd like to touch briefly on just two issues. First, the Court asked before I sat down what we should do here if you were to reverse on the 1983 cause of action in light of the Supreme Court cases. And I would point the Court back to the status of this case before the Court issued a preliminary injunction. This case was stayed pending the Supreme Court decisions, so we would ask simply that the Court remand the case back to the district court and put this case back in the posture it was before the stay was lifted and the injunction motions were granted. Second, I would like to touch briefly on a point that counsel raised in his argument. I heard a lot of discussion about the overall statutory framework requiring preapproval. He cited 1396A and 1316. We think those statutes actually contemplate that a state will implement a state plan amendment prior to receiving approval. Specifically, 1316 states that if an amendment is not in compliance with the Medicaid Act, the secretary shall withhold federal financial participation. If state plan approval were required, the state plan would never be out of compliance with the Medicaid Act and that financial participation language would be basically surplus and unnecessary. But putting that aside, let's assume for the sake of argument that the overall statutory framework does require preapproval. That only gets them halfway. They have to identify a specific statute conferring on them an unambiguous right, and relying on Exeter doesn't get them there either because Exeter was decided before Gonzaga was decided in 2002 and before this Court decided Sanchez in 2005. And those cases make very clear. Plaintiffs proceeding under 1983 must identify a statute conferring upon them an unambiguous right to enforce that statute. And unless the Court has any further questions. There do not appear to be additional questions. Thank you for your argument. This matter will stand submitted and court is now in adjournment. All rise. Thank you.
judges: Erickson, Fernandez, Callahan